UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| THE FARMERS & MERCHANTS STATE BANK, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | No. 3:09-cv-0376 Judge Sharp |
| DIRECT SCAFFOLD SERVICES CO., LLC | ) ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) ) | |
| CONTRACTORS ACCESS EQUIPMENT, INC. | ) ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) ) | |
| THE FARMERS & MERCHANTS STATE BANK, | ) ) ) ) | |
| Respondent. | ) | |

# MEMORANDUM

Contractors Access Equipment, Inc. ("CAE") filed a Motion to Enforce Judgment (Docket No. 54) of the Court's December 2009 Order (Docket No. 27) approving the sale of Direct Scaffold Services ("DSS"). The Farmers & Merchants State Bank ("Farmers") filed a Motion for Summary Judgment (Docket No. 81) as to CAE's Motion to Enforce.

The Court will grant Farmers' Motion.

## BACKGROUND

DSS is a Tennessee limited liability company that sells scaffolding products, ladders, and accessories. (Docket No. 1, p. 2.) In February 2007, DSS took out a loan from Farmers. (Docket No. 1, pp. 1–2.) Attached to the Loan Agreement was a Security Agreement that gave Farmers a lien on all of DSS's assets in the event of default. (Docket No. 1, p. 2.)

DSS eventually defaulted. Farmers filed a complaint in the U.S. District Court for the Southern District of Ohio, which quickly entered a judgment in favor of Farmers for $3,906,321.69, plus interest. (Docket No. 1, p. 2.) To avoid harm to DSS's creditors, employees, and customers, Farmers asked this Court to appoint a receiver for DSS. (Docket No. 1.) The Court granted Farmers' request. (Docket No. 4.)

The receiver held a Court-approved auction sale of DSS's assets in December 2009. There, the assets were purchased by CAE, another Tennessee corporation that sells scaffolding equipment.[1] (See Docket No. 21.) CAE's winning bid set the purchase price at $2,900,000. (Docket No. 27, p. 2.) Phil Mumford, Sr.—the sole owner of CAE—paid that entire sum with money from his personal accounts. (Docket No. 81, ex. A, pp. 56–57.)

Soon after winning the auction sale, Mumford, Sr. formed Contractors Access Equipment of Jackson, Inc. ("CAE-Jackson"). (Docket No. 81, ex. A, 56.) Mumford, Sr. was the sole owner of CAE-Jackson until January 2012, when he transferred all of his ownership interest to his son, Phil Mumford, Jr. (Docket No. 85-2, p. 2.)

Though the Mumfords owned both CAE and CAE-Jackson, the two corporations are separate legal entities. The Mumfords have explained that they waited until after the sale to incorporate CAE-Jackson because they wanted to "kn[o]w what the outcome of the auction

---

[1] Farmers maintains that "CAE did not actually purchase—and never owned—the assets of Direct Scaffold." (Docket No. 85-1, pp. 2–3.) CAE disputes this and points out that CAE was named as the "Purchaser" on the Agreement of Sale and the "Successful Bidder" in the Court's approval of the sale. (Docket No. 85-1, p. 3.)

was." (Docket No. 81, ex. A, p. 22.) Still, the Mumfords "had every intention to form [CAE-Jackson] to take possession of the [DSS] assets;" indeed, throughout the transfer process, CAE itself "never took possession of the [DSS] assets." (Docket No. 81, ex. A, pp. 22, 56.)

The transfer hit a snag in early 2010. Around that time, CAE-Jackson spotted discrepancies in the DSS inventory lists; the asset-transfer was delayed for a few months while CAE-Jackson and the receiver negotiated the inventory problems. (Docket No. 85, pp. 1, 3–4.) A month later, Mumford, Jr. received notice that DSS owed Rankin County, Mississippi $40,347.39 in unpaid personal property taxes on its Pearl, Mississippi location. (See Docket No. 55, ex. B; Docket No. 81, ex. A, pp. 39–41.) Mumford, Jr. recognized that the lien was a "significant problem," but concedes that he was far more concerned with sorting out DSS's inventory than with the outstanding tax debt. (Docket No. 81, ex. A, p. 44.) Mumford later said that he "figured [the tax lien] was a matter for" the receiver "because it was a [pre-sale] liability," (Docket No. 81, ex. A, pp. 42–43) while the receiver admits that the issue simply "fell off the radar." Docket No. 81, ex. B, pp. 20–21.) In any event, the tax lien was quickly forgotten. It went unpaid.

On November 10, 2010, CAE and CAE-Jackson executed a Settlement and Release Agreement with the receiver. (See Docket No. 81, ex. B, ex. A.) The receiver, DSS, CAE, and CAE-Jackson were all listed as parties to the Release Agreement. (See Docket No. 81, ex. B, ex. A.) In his deposition, Mumford, Jr. said that the Release Agreement was intended "to resolve the inventory dispute" and confirmed that it was meant to "close[] out all remaining disputes with" Farmers over any price discrepancies. (Docket No. 81, ex. A, pp. 57, 58–59.) The Court approved the Release Agreement on November 24, 2010. In the same order, it ended the receivership and dismissed the case. (Docket No. 51.)

In July 2011, Mumford, Jr. received another notice from Rankin County about the County's tax lien on DSS's assets. (Docket No. 81, ex. A, p. 46.) Mumford did not contact Farmers' representatives about the unpaid tax debt. (Docket No. 81, ex. A, p. 47.) Nor did he try to pay it. As he explained in his deposition, he thought that the Court's December 2009 Order—which stated that the DSS assets had been transferred without any outstanding liens—would "override any collection efforts from the governments in Mississippi." (Docket No. 81, ex. A, p. 46.) After consulting with two Mississippi lawyers, Mumford, Jr. decided to do nothing about the liens.

Three years passed. Then, in the spring of 2014, Rankin County intensified its collection efforts: The County sued CAE-Jackson and sent the sheriff to lock down DSS facility in Pearl. (Docket No. 55, ex. C; Docket No. 81, ex. A, pp. 49–50.) Mumford, Jr. immediately contacted the receiver and Farmers' representatives for assistance, but heard no response. He eventually came to a settlement with Rankin County for $107,184.54. (Docket No. 66, p. 2.)

Around the same time, Mumford, Jr. learned that DSS had a second outstanding tax lien in Stone County, Mississippi. (Docket No. 55, ex. D.) Mumford, Jr. reached a settlement with Stone County for $56,656.42, plus interest at a rate of 1% per month in monthly installments of $2,500. Both tax settlements were paid with funds from CAE-Jackson's accounts. (Docket No. 85-2, p. 6.)

In July 2014, CAE filed a Petition to Enforce the Court's December 2009 Order. (Docket No. 54.) That Petition, which states that CAE paid the outstanding tax debt, requests that the Court "require[e] [Farmers] to reimburse [CAE] for the $171,028.47 in back taxes, interest, and fees related to the Direct Scaffold assets that it has paid." (Docket No. 54, p. 3.) The petition

4

never mentions CAE-Jackson, nor does it acknowledge that CAE-Jackson actually paid the tax debts.

After CAE filed its Motion to Enforce, the receiver and Farmers both filed objections. (Docket Nos. 56, 57.) On February 25, 2015, the Court ruled that its December 2009 Order was enforceable as to Farmers, but not as to the receiver. (Docket Nos. 66, 67.) In that ruling, the Court reopened the case and referred it to the Magistrate Judge for case management. (Docket No. 67.)

Farmers moved for summary judgment on November 6, 2015. (Docket No. 81.) It argues, among other things, that CAE has no standing to seek reimbursement for paying DSS's outstanding tax debts. (Docket No. 83, pp. 10–11.)

## **LEGAL STANDARD**

Summary judgment "is appropriate only where 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.' " Whitfield v. Tenn., 639 F.3d 253, 258 (6th Cir. 2011) (quoting Fed. R. Civ. P. 56(c)). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A court's function at the summary-judgment stage is simply to "determine whether there is a genuine issue for trial." Id. at 249. In doing so, a court must draw "all reasonable inferences in favor of the nonmoving party." Shreve v. Franklin Cty., Ohio, 743 F.3d 126, 132 (6th Cir. 2014) See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## ANALYSIS

Article III of the Constitution confines the judicial power of the federal courts to actual "Cases" and "Controversies." U.S. CONST. art. III, § 2. As the Supreme Court has said, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006) (quoting Raines v. Byrd, 521 U.S. 811, 818 (1997)). A federal court "may exercise power only . . . 'as a necessity,'" that is, only when sure that it has an actual case before it. Allen v. Wright, 468 U.S. 737, 752 (1984). When a dispute is not a proper case or controversy, a court "ha[s] no business deciding it." Cuno, 547 U.S. at 341.

Courts "have always insisted on strict compliance with th[e] jurisdictional standing requirement." Raines, 521 U.S. at 819. And it has always been clear that a party who has no direct, personal stake in the litigation cannot seek relief from a federal court. See, e.g., Lance v. Coffman, 549 U.S. 437, 439 (2007) (plaintiff must seek relief that "directly and tangibly benefits *him*" (emphasis added)); Lujan v. Defenders of Wildlife, 504 U.S. 555, 573 (1992); Larson v. Valente, 456 U.S. 228, 244, n. 15 (1982) (Article III requires that a plaintiff show that a favorable outcome "will relieve a discrete injury to *himself*" (emphasis added)); Warth v. Seldin, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury *to the complaining party*." (emphasis added)).

The requirements for standing are well established. A plaintiff must show (1) an injury in fact that is (2) fairly traceable to the challenged actions of the defendant and (3) likely to be redressed by a favorable judicial decision. See Lujan v. Defenders of Wildlife, 504 U.S. 555,

560–561 (1992) (referring to the "irreducible constitutional minimum" of the three-part standing test).

Farmers argues that CAE has not met these requirements. It bases this argument on the "undisputed fact . . . that CAE-Jackson, not CAE, paid . . . to satisfy the tax liens on the equipment formerly owned by Direct Scaffold." (Docket No. 83, p. 10.) It argues that CAE is a "separate and distinct entity from CAE-Jackson," so CAE incurred no financial harm from the tax liens. (Docket No. 83, p. 10.) In light of this, Farmers continues, CAE has suffered no injury from the tax debt and lacks standing to seek reimbursement for the tax payments. (Docket No. 83, p. 10.)

In response, CAE argues that it has standing because of two injuries. First, it maintains that when it bought assets that had undisclosed tax liability, CAE "received less than it bargained for." (Docket No. 85, p. 15.) And second, it contends that it suffered an injury when it was exposed to potential liability from Stone County, Rankin County, and CAE-Jackson. (Docket No 85, p. 15.)

As the Court explains below, both of CAE's arguments fail. To qualify as an injury-in-fact, an alleged harm must be "concrete and particularized, and "actual or imminent, not conjectural or hypothetical." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180 (2000). And crucially, Article III judicial power exists only to redress "an injury *to the complaining party*." Vt. Agency of Nat'l Res. v. U.S. ex. Rel. Stevens, 529 U.S. 765, 771 (2000). CAE has not shown that it suffered any injury in this dispute. Its claim will be dismissed.

**I. Did CAE suffer an injury by overpaying for the DSS assets?**

CAE claims that, as a result of Farmers' actions, it received less than it bargained for when it bought "assets that were not free and clear of liens and encumbrances and carried with them a hidden liability." (Docket No. 85, p. 15.) Essentially, it argues that it overpaid.

Overpaying can qualify as an injury to support standing. The Supreme Court has repeatedly held that "palpable economic injuries" are "sufficient to lay the basis for standing." Sierra Club v. Morton, 405 U.S. 727, 733–34 (1972). And the Court has held that plaintiffs who pay too much as a result of discriminatory tax laws have a cognizable injury. See, e.g., Gen. Motors Corp. v. Tracy, 519 U.S. 278, 286 (1997) (consumers who overpay for gas as a result of discriminatory tax laws had Article III standing); Fulton Corp v. Faulkner, 516 U.S. 325 (1996); West Lynn Creamery, Inc. v. Healy, 512 U.S. 186 (1994). Lower courts have followed this rule. In Maya v. Centex Corp., 658 F.2d 1060, 1069 (9th Cir. 2011), a group of homeowners "claim[ed] that . . . they paid more for their homes than the homes were worth at the time of sale" because defendants had failed to make disclosures required by law. The Sixth Circuit held that the homeowners had standing, finding that the homeowners' overpayments were "actual and concrete economic injuries" that constitute "a quintessential injury-in-fact." Id. 658 F.2d at 1069.

But in each of those cases, the plaintiffs themselves paid for the goods or services at issue. CAE, on the other hand, never paid for anything. Once the sale was approved, the entire $2.9 million purchase price was paid from the personal accounts of CAE's owner, Phil Mumford, Sr. (See Docket No. 85-1, p. 3 (admitting that Mumford, Sr. "provided personal funds which were the sole source of funds utilized to purchase the Direct Scaffold assets").) His son confirmed this in a deposition:

> Q: As far as you're concerned or as far as you know, no money exchanged hands [in the purchase of the DSS assets.] Contractors Access Equipment of Jackson didn't purchase it from Contractors Access Equipment, Inc.?
>
> A: No, that did not happen. All the money that came in would have come from my father personally.
>
> Q: Personally or from Contractors Access Equipment, Inc.?
>
> A: No. My father's personal money would have been the sole source of funds for the deposit and all the payments for the assets for the old Direct Scaffold.
>
> Q: So when $2 million came down, that came from Phil Mumford, Sr.?
>
> A: That is correct.

(Docket No. 81, ex. A, pp. 56–57.)

CAE never put any money up for the DSS assets, so it would be incorrect to say that it suffered any economic injury through overpayment; if anybody suffered an injury in paying too much for the assets, it was Mumford, Sr. himself. And, of course, CAE may only sue to remedy *its own* injuries—not those of another person. See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 106 (1998) (finding no standing when respondent did "not [seek] remediation of its *own* injury" (emphasis added)).

CAE seems to anticipate its problem. In its brief, it urges the Court to find that, since CAE had only one owner when it bought the DSS assets, the owner's actions with respect to those assets should be construed as the actions of CAE. It notes that CAE was "100% owned by Mumford, Sr." at the time of the purchase. (Docket No. 85, p. 14.) And in its responses to Farmers' statement of facts, it asserts that "CAE legally purchased and owned the Direct Scaffolding Assets after Phil Mumford, Sr., the 100% owner of CAE, issued payment directly to

9

the Receiver at closing." (Docket No. 85-1, p. 3.)  Put simply, CAE asks the Court to see CAE and Mumford, Sr. as one in the same.  The Court declines to do so.

A corporation's existence is separate and distinct from that of its owner.  See, e.g., Mich. Laborers' Health Care Fund v. HER Constr., LLC, 2013 WL 594483, at *2 (6th Cir. Feb. 15, 2013) ("Generally, a corporation is considered an entity separate and distinct from its owners or shareholders.").  Foster Wheeler Energy Corp. v. Metro. Knox Solid Waste Auth., Inc., 970 F.2d 199, 202 (6th Cir. 1992) (construing Tennessee law).  A corporation may not selectively disregard the corporate veil that separates its legal identity from that of its owner.  Schenley Distillers Corp. v. United States, 326 U.S. 432, 437, 66 S. Ct. 247, 249, 90 L. Ed. 181 (1946) ("One who has created a corporate arrangement, chosen as a means of carrying out his business purposes, does not have the choice of disregarding the corporate entity in order to avoid [its] obligations."); Moline Props., Inc. v. Comm'r, 319 U.S. 436 (1943) (holding that a sole shareholder may not sidestep the corporate "separateness" to gain a personal tax advantage).  To let an owner to don and shed the corporate form at his convenience "flies in the face of all theories of corporate law."  Volasco Prods. Co. v. Lloyd A. Fry Roofing Co., 308 F.3d 383, 394 (6th Cir. 1962).

Moreover, CAE has not made a convincing case that it should be allowed to pierce its own corporate veil.  Though some courts have allowed reverse piercing,[2] see, e.g., Roepke v. Western National Mutual Insurance, 302 N.W.2d 350, 353 (Minn. 1981), the law typically "does not allow . . . 'reverse piercing' the corporate veil when it suits the corporation's owner."

---

[2] CAE's request is more accurately described as "insider reverse piercing," which involves "a corporate insider, or someone claiming through such individual, attempt[ing] to pierce the corporate veil from within so that the corporate entity and the individual will be considered one in the same." Postal Instant Press, Inc. v. Kaswa Corp. 77 Cal. Rptr. 3d 96, 101 (Cal. Ct. App. 2008).  The distinction does not help CAE's case, however: a "substantial number of state and federal decisions . . . have refused to allow an insider reverse pierce."  Gregory S. Crespi, *The Reverse Veil-Piercing Doctrine: Applying Appropriate Standards*, 16 J. CORP. L. 33, 54 (1990).

Uniboard Aktiebolag v. Acer Am. Corp., 118 F. Supp. 2d 19, 25 (D.D.C. 2000). This principle is in keeping with the idea that, generally speaking, veil-piercing is a doctrine of equity, to be used only to "correct fraud, illegality, or injustice." Coach, Inc. v. Younes Corp., Inc., 2012 WL 4757925, at *3 (E.D. Mich. Oct. 5, 2012). See also, e.g., Laborer's Pension Tr. Fund v. Sidney Washington Homes, Inc., 872 F.2d 702, 705 (6th Cir. 1988) (piercing the corporate veil to hold a shareholder liable, where shareholder paid corporate expenses from his personal accounts and withdrew corporate funds for personal use). CAE's argument offends that principle: it is hardly equitable to allow a party to sidestep its corporate personality in order to gain standing for an injury that it never suffered.

**II. Did CAE Suffer an Injury by Purchasing Assets that Carried Undisclosed Tax Liabilities?**

CAE argues that it "sustained a . . . potential loss . . . in connection with" the tax liability. (Docket No. 85, p. 15.) The argument implies that, at some point after bidding on the DSS assets, CAE was liable to Stone and Rankin Counties for DSS's unpaid taxes.

But any risk of injury associated with that tax debt has long since disappeared. When Stone and Rankin Counties collected their debts, they came after CAE-Jackson, not CAE. And CAE-Jackson paid the entire settlement amount. CAE, on the other hand, paid nothing. Mumford, Jr. said as much in his deposition:

> Q: [T]his judgment reflects it's between Rankin County, Mississippi, and Contractors Access Equipment of Jackson, Inc., d/b/a Direct Scaffold Services; correct?
>
> A: Mm-hmm, yes.
>
> Q: Now, Contractors Access Equipment of Jackson, Inc., is that the party who satisfied the judgment referred to in this case?
>
> A: Yes.

> Q: And then there was a requirement to pay . . . $53,000 to be paid at a later date; correct?
>
> A: Correct.
>
> Q: And did Contractors Access Equipment of Jackson, Inc. pay that amount?
>
> A: Yes.

(Docket No. 81, ex. A, p. 52.)

Later in the deposition, Mumford confirmed that CAE-Jackson paid the entire settlement in the Stone County tax debt, too:

> Q: Okay. We haven't talked about it yet, but there's a Stone County lien as well; correct?
>
> A: Correct.
>
> Q: Since it's on here, I'm going to refer to the third page of this document which is CAE239. These reflect payments for an agreement that you reached on Stone County; is that correct?
>
> A: Yes.
>
> Q: Did these [payments] come out of the same bank account as the one that paid off the Rankin County lien?
>
> A: Yes, they did.
>
> Q: So that would also be the Contractors Access of Jackson account?
>
> A: Yes.

(Docket No. 81, ex. A, pp. 53–54.)

Even if CAE had been exposed to liability to Stone and Rankin Counties, that liability disappeared as soon as the Counties collected the taxes from CAE-Jackson. To find otherwise would be to allow CAE to assert standing based on an injury that *could* have occurred at some point in the past, but never did occur—in other words, a hypothetical injury. Hypothetical

injuries are never enough to satisfy Article III. See, e.g., Clinton v. City of New York, 524 U.S. 417, 459 (1998) ("As we have said many times, conjectural or hypothetical injuries do not suffice for Article III standing."); Déjà vu Nashville, Inc. v. Metro. Gov't of Nashville and Davidson Cty., Tenn., 274 F.3d 377, 390 (6th Cir. 2001) ("Hypothetical injury does not equal injury-in-fact.").

CAE also mentions its "potential liability to Contractors Access Jackson in connection with the tax liability" as a basis for standing. (Docket No. 85, p. 15.) But that potential liability is not enough, either. CAE-Jackson has not sued CAE for reimbursement of the tax payments, and nothing suggests that CAE-Jackson plans to sue anytime soon. CAE would need to show something more to establish that a lawsuit is imminent, or even likely; a mere possibility of a suit is simply too speculative to support standing. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992); Rosen v. Tenn. Comm'r of Fin. & Admin., 288 F.3d 918, 919 (6th Cir. 2002) ("A threatened injury must be certainly impending to constitute injury in fact.") (internal quotations omitted). The Court will not let CAE turn the standing inquiry into an "exercise in the conceivable." Green Party of Tenn. v. Hargett, 700 F.3d 816, 829 (6th Cir. 2012) (quoting Summers v. Earth Island Inst., 555 U.S. 488, 499 (2009)).

## **CONCLUSION**

CAE never paid for the DSS assets, never took possession of the DSS assets, and never paid the outstanding tax debts attached to the DSS assets. CAE has not shown that it suffered any injury. It has no standing to try this dispute in federal court.

The Court will grant Farmers' Motion for Summary Judgment. An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE